UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **COMPLAINT** |
| | : | **07 CV 1774 (PKC)** |
| MITCHEL S. GUTTENBERG, | : | **"ECF CASE"** |
| ERIK R. FRANKLIN, | : | |
| DAVID M. TAVDY, | : | |
| MARK E. LENOWITZ, | : | |
| ROBERT D. BABCOCK, | : | |
| ANDREW A. SREBNIK, | : | |
| KEN OKADA, | : | |
| DAVID A. GLASS, | : | |
| MARC R. JURMAN, | : | |
| RANDI E. COLLOTTA, | : | |
| CHRISTOPHER K. COLLOTTA, | : | |
| Q CAPITAL INVESTMENT PARTNERS, LP, | : | |
| DSJ INTERNATIONAL RESOURCES LTD. (d/b/a | : | |
| CHELSEY CAPITAL), and | : | |
| JASPER CAPITAL LLC, | : | |
| | : | |
| Defendants. | : | |

---

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## NATURE OF THE ACTION

1.      This case involves two insider trading schemes in which Wall Street professionals serially traded on material, nonpublic information tipped -- in exchange for kickbacks -- by insiders at UBS Securities LLC ("UBS") and Morgan Stanley and Co., Inc. ("Morgan Stanley").  In the first scheme, which has been ongoing since 2001, at least eight securities industry professionals, three hedge funds, two broker dealers, and a day-trading firm, made thousands of illegal trades and millions of dollars in profits using

inside information provided by an executive of UBS to trade ahead of UBS analyst recommendations (the "UBS insider trading scheme"). In the second scheme, several securities industry professionals and a hedge fund made dozens of illegal trades and hundreds of thousands of dollars in profits using inside information provided by an attorney at Morgan Stanley to trade ahead of corporate acquisition announcements (the "Morgan Stanley insider trading scheme"). Collectively, defendants made at least $15 million in illicit profits from these two insider trading schemes.

2.      In the UBS insider trading scheme, from at least 2001 through 2006, Mitchel S. Guttenberg ("Guttenberg"), an executive director at UBS, illegally tipped material, nonpublic information concerning upcoming UBS analyst upgrades, downgrades and other recommendations, to at least two Wall Street traders -- Erik R. Franklin ("Franklin") and David M. Tavdy ("Tavdy"), in exchange for sharing in the illicit profits from their trading on that information. Franklin illegally traded on this inside information for Lyford Cay Capital, LP ("Lyford Cay"), a hedge fund at Bear, Stearns & Co., Inc. ("Bear Stearns") that Franklin managed, Q Capital Investment Partners, LP ("Q Capital"), another hedge fund Franklin managed, and in his and his father-in-law's personal accounts. Tavdy illegally traded on this inside information for Andover Brokerage, LLC ("Andover") and Assent LLC ("Assent"), registered broker-dealers where Tavdy was a proprietary trader, in the accounts of Jasper Capital LLC ("Jasper Capital"), a day-trading firm with which Tavdy was associated, and in his and others' personal accounts.

3.      Franklin and Tavdy also had downstream tippees who traded on this material, nonpublic UBS information. Franklin tipped Mark E. Lenowitz ("Lenowitz"),

who illegally traded on this inside information for DSJ International Resources Ltd. (d/b/a/ "Chelsey Capital"), a private hedge fund at which Lenowitz was a portfolio manager, and in his personal accounts. Three registered representatives at Bear Stearns who knew of Franklin's UBS tips -- Robert D. Babcock ("Babcock"), Andrew A. Srebnik ("Srebnik"), and Ken Okada ("Okada") -- illegally traded on this inside information in their personal accounts and, in the case of Babcock, also for Lyford Cay. In addition, David A. Glass ("Glass"), the owner of Jasper Capital, a day-trading firm that operated from Assent's offices, traded on this inside information for Jasper Capital, and paid kickbacks to supervisory personnel at Assent to not disclose this trading scheme. Together, Guttenberg, Franklin, Tavdy, and their tippees made at least $14 million in illegal profits in connection with the UBS insider trading scheme.

4.    In the Morgan Stanley insider trading scheme, from at least 2004 through 2005, Randi E. Collotta, an attorney in Morgan Stanley's global compliance department, misappropriated material, nonpublic information concerning upcoming corporate acquisitions involving the firm's investment banking clients. Randi Collotta, together with her husband, Christopher K. Collotta, a lawyer in private practice, tipped that inside information to Marc R. Jurman ("Jurman"), a registered representative at a broker-dealer in Florida, in exchange for sharing in the illicit profits from Jurman's trading on that information. Jurman illegally traded on this inside information in his own account, and through his friend, Babcock, a registered representative at Bear Stearns who also was part of the UBS insider trading scheme. Babcock illegally traded on this inside information, sharing some of his illicit profits with Jurman, and tipped this information to Franklin and Okada, who also were part of the UBS insider trading scheme. Franklin illegally traded

on this inside information for Q Capital and in his father-in-law's account, and Okada illegally tipped this inside information to his father-in-law who then traded on the information.  Together, the Collottas, Jurman, and their tippees made at least $600,000 in illegal profits in connection with the Morgan Stanley insider trading scheme.

* * * * *

5.     By virtue of their conduct, each of the Defendants involved in these two insider trading schemes violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5], and Defendants Q Capital, Chelsey Capital, Jasper Capital, Guttenberg, Franklin, Tavdy, Lenowitz, Babcock, Srebnik, and Glass also violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)].  Unless enjoined, Defendants are likely to commit such violations again in the future.

### JURISDICTION AND VENUE

6.     This Court has jurisdiction over this matter pursuant to Securities Act Sections 20(b), 20(d), and 22(a) [15 U.S.C. §§ 77t(b), (d), and 77v(a)] and Exchange Act Sections 21(d)(1), 21(e), 21A, and 27 [15 U.S.C. §§ 78u(d)(1), (e), 78u-1, and 78aa].  Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce or the mails in connection with the conduct alleged herein.

7.     Venue is proper because certain acts or transactions constituting the violations occurred within this judicial district.

## DEFENDANTS

8.      **Mitchel S. Guttenberg**, age 41, resides in New York, New York. Guttenberg is a registered representative at UBS Securities LLC in New York, New York, and is an executive director and institutional client manager in the firm's equity research department.

9.      **Erik R. Franklin**, age 39, resides in Fort Lee, New Jersey.  At various times during the relevant period, Franklin was a portfolio manager for Lyford Cay Capital, LP and an employee of Bear, Stearns & Co., Inc. in New York, New York, an analyst for Chelsey Capital in New York, New York, and a portfolio manager for Q Capital Investment Partners, LP in Fort Lee, New Jersey.

10.     **David S. Tavdy**, age 38, resides in Forest Hills, New York.  At various times during the relevant period, Tavdy was a proprietary trader and registered representative at Andover Brokerage, LLC in New York, New York, a proprietary trader and registered representative at Assent LLC in New York, New York, and a trader at Jasper Capital LLC.

11.     **Mark E. Lenowitz**, age 43, resides in Norwood, New Jersey.  At times during the relevant period, Lenowitz was a portfolio manager for Chelsey Capital in New York, New York, and was a limited partner in Q Capital Investment Partners, LP.

12.     **Robert D. Babcock**, age 33, resides in New York, New York.  Babcock is a registered representative at Suntrust Capital Markets, Inc.  During the relevant time period, Babcock was a registered representative at Bear, Stearns & Co., Inc. in New York, New York, and was associated with Lyford Cay Capital, LP.

13.     **Andrew A. Srebnik**, age 35, resides in New York, New York.  Srebnik is a registered representative at Jefferies & Company, Inc.  During the relevant time period, Srebnik was a registered representative at Bear, Stearns & Co., Inc. in New York, New York.

14.     **Ken Okada**, age 31, resides in New York, New York.  Okada is a registered representative at Cathay Financial, Inc.  During the relevant time period, Okada was a registered representative at Bear, Stearns & Co., Inc. in New York, New York.

15.     **David A. Glass**, age 32, resides in Brooklyn, New York.  Glass is the owner and president of Jasper Capital LLC.  At times during the relevant period, Glass also was a registered representative at Assent LLC in New York, New York.

16.     **Randi E. Collotta**, age 30, resides in Bayport, New York.  Randi Collotta is an attorney and is the Director of Securities Operations at The Garden City Group, Inc.  During the relevant time period, Randi Collotta was an attorney in the global compliance department of Morgan Stanley & Co., Inc. in New York, New York.

17.     **Christopher K. Collotta**, age 34, resides in Bayport, New York.  Christopher Collotta is an attorney in private practice.

18.     **Marc R. Jurman**, age 31, resides in Palm Beach Gardens, Florida.  At times during the relevant period, Jurman was a registered representative at the Boca Raton, Florida branch office of Marlins Capital, LLC, a registered broker-dealer, and a registered representative at the Boca Raton, Florida branch office of Finance 500, Inc., a registered broker-dealer.

19.   **Q Capital Investment Partners, LP** is a Delaware limited partnership with offices in Fort Lee, New Jersey.  During the relevant time period, Q Capital operated as a hedge fund.

20.   **Jasper Capital LLC** is a New York limited liability company owned by David A. Glass.  During the relevant time period, Jasper Capital operated as a day-trading firm from the offices of Assent LLC in New York, New York.

21.   **DSJ International Resources Ltd.**, which does business as "Chelsey Capital," is a New York corporation with offices in New York, New York.  During the relevant time period, Chelsey Capital operated as a private hedge fund.

### OTHER RELEVENT ENTITIES AND PERSONS

22.   **UBS Securities LLC** is a Delaware limited liability company headquartered in New York, New York.  UBS is a registered broker-dealer and a registered investment adviser.

23.   **Bear, Stearns & Co., Inc.** is a Delaware corporation headquartered in New York, New York.  Bear Stearns is a registered broker-dealer and a registered investment adviser.

24.   **Morgan Stanley & Co., Inc.** is a Delaware corporation headquartered in New York, New York.  Morgan Stanley is a registered broker-dealer and a registered investment adviser.

25.   **Assent LLC** is a Delaware limited liability company headquartered in Hoboken, New Jersey.  Assent is a registered broker-dealer.

26.     **Andover Brokerage, LLC** was a New York limited liability company headquartered in Montebello, New York.  During the relevant time period, Andover was a registered broker-dealer.  In March 2003, Andover was acquired by Assent.

27.     **Lyford Cay Capital, LP** was a Delaware limited partnership.  During the relevant time period, Lyford Cay operated as a hedge fund from the offices of Bear Stearns in New York, New York.  Lyford Cay was dissolved in 2004.

## STATEMENT OF FACTS

### I.     THE UBS INSIDER TRADING SCHEME

#### A.     Guttenberg's Access to Upcoming UBS Analyst Recommendations

28.     Guttenberg is a registered representative at UBS, and is an executive director and institutional client manager in the firm's equity research department.  As part of his duties at UBS, Guttenberg serves on UBS's Investment Review Committee ("IRC"), which reviews and approves UBS analyst recommendations, including coverage initiations, upgrades and downgrades, and other UBS analyst recommendation changes, before they are issued and publicly disseminated.

29.     UBS's IRC convenes every business morning at 11:00 a.m.  Each morning before the IRC meets, an agenda for that day's meeting, which includes a summary of the proposed analyst recommendations, is distributed by email to approximately eighty individuals at UBS on an email distribution list.  This distribution list includes members of the IRC and others at UBS.  Since at least 2001, Guttenberg has been a member of the IRC and has been on this email distribution list.

30.     At the 11:00 a.m. IRC meeting, the IRC decides whether to approve the proposed analyst recommendations that are the subject of that meeting.  That same day,

shortly after the meeting, the results of the meeting, including summaries of the approved analyst recommendations, are distributed to the same email distribution list described above. Generally, the analyst recommendations approved by the IRC are then forwarded that same day to supervisory analysts for final review and approval, and then are issued and publicly disseminated the following business morning before the U.S. securities markets open.

31.    Between at least December 2001 and January 2003, UBS's equity rating system included five ratings -- "Strong Buy," "Buy," "Hold," "Reduce," and "Sell." From January 2003 to the present, UBS's equity rating system included three recommendations -- "Buy," "Neutral," and "Reduce."

32.    Information concerning upcoming UBS analyst recommendations is valuable and material, nonpublic information. Once announced, a UBS analyst recommendation often affects the market price of the stock that is the subject of the recommendation. A UBS analyst upgrade on a stock, for example, typically will result in an increase in the stock price, while a downgrade typically will result in a decrease in the stock price. A reasonable investor would consider information concerning an upcoming UBS analyst recommendation important to his or her investment decision, and a significant alteration of the total mix of information available to the public concerning the stock that is the subject of the recommendation.

33.    Since at least 2001, Guttenberg has been on UBS's IRC and the above described email distribution list, and thus has daily received material, nonpublic information concerning upcoming UBS analyst recommendations. As an employee of UBS, Guttenberg owed a fiduciary or other duty of trust and confidence to UBS to keep

that information confidential and not disclose or personally use that information. UBS's equity research manual specifically provides that:

> The distribution of pending research, whether verbally or otherwise, to persons outside the Research Department prior to its issuance by the Research Department is prohibited by firm policy, and may subject the Firm to civil as well as regulatory liability.
>
> Knowledge of a pending recommendation or change in opinion or estimates is considered to be 'market-sensitive information.' Pending initial recommendations, price target, estimate or opinion changes, and decisions to issue research reports or comments may not be disclosed by any means to anyone, either inside or outside of the Firm, until the information has been appropriately disseminated.

**B.**     **Guttenberg's Insider Trading Scheme with Franklin**

    **1.**     **Franklin's Illegal Trading**

34.    Guttenberg and Franklin are friends and have known each other for many years. Guttenberg's trading scheme with Franklin was hatched in 2001, when the two were meeting at the Oyster Bar in New York City. At the time, Guttenberg owed Franklin $25,000 on a personal loan. While meeting at the Oyster Bar, Guttenberg proposed paying off that debt by providing Franklin with upcoming UBS analyst recommendations on which Franklin could trade before the recommendations became public. Franklin agreed.

35.    Soon thereafter, in breach of Guttenberg's duty to UBS, Guttenberg began providing Franklin with material, nonpublic information concerning upcoming UBS analyst recommendations, including coverage initiations, upgrades and downgrades, and other analyst recommendation changes, which Franklin began using to purchase and sell securities in his personal accounts and for Lyford Cay, a hedge fund he managed at Bear

Stearns. Franklin knew, or should have known, that Guttenberg was breaching his duty to UBS by tipping Franklin this material, nonpublic information.

36.    Guttenberg and Franklin agreed to share the after-tax profits from this illegal trading scheme. Originally, Guttenberg's share of the profits from this illegal trading scheme was applied to pay off Guttenberg's personal debt to Franklin. After that debt was paid, Guttenberg and Franklin continued the trading scheme and Franklin began paying Guttenberg his portion of the illegal profits in cash at arranged meeting places.

37.    Early in this scheme, Guttenberg and Franklin both worked in New York City, and generally would meet in person for Guttenberg to provide Franklin with the upcoming UBS analyst recommendations. This process was cumbersome, however, given the volume of recommendations and the need to trade on that information quickly. So as the scheme evolved, Guttenberg and Franklin purchased disposable cell phones so that they had a convenient means to communicate that would be difficult for others to detect or trace. Using these disposable cell phones, Guttenberg sent coded text messages to Franklin of the upcoming UBS analyst recommendations. They would still meet in person from time to time for Franklin to pay Guttenberg his portion of the profits from the illegal trading, which they also arranged through text messaging on the disposable phones.

38.    From 2001 through 2006, in breach of his duty to UBS, Guttenberg regularly provided Franklin with material, nonpublic information concerning upcoming UBS analyst recommendations. During that time period, using that material, nonpublic information, Franklin purchased and sold securities in his personal accounts, in the accounts of the two hedge funds he managed, Lyford Cay and Q Capital, and in an

11

account in the name of his father-in-law.  Illicit profits from Franklin's illegal trading in these accounts exceeded $5 million.

### 2.     Lyford Cay and The Bear Stearns Tippees' Illegal Trading

39.     When this illegal scheme first began, Franklin was a portfolio manager for the Lyford Cay hedge fund at Bear Stearns.  Lyford Cay operated out of the New York City offices of Bear Stearns, and its investors included certain senior officials of the firm. Franklin, who was an employee of Bear Stearns, was a portfolio manager for Lyford Cay from approximately April 2001 through February 2002.  From at least December 2001 through February 2002, Franklin purchased and sold securities for Lyford Cay using material, nonpublic information concerning upcoming UBS analyst recommendations tipped to him by Guttenberg.

40.     Robert Babcock, a registered representative at Bear Stearns, entered trade orders for Lyford Cay during the time that Franklin managed that fund.  Babcock also entered trade orders in Franklin's personal accounts at Bear Stearns, which Franklin kept at Bear Stearns after leaving Lyford Cay.  Based on Franklin's trading patterns -- often making a profitable purchase or short sale of a security just before a UBS analyst upgrade or downgrade -- Babcock knew that Franklin was using material, nonpublic information to trade ahead of upcoming UBS analyst recommendations.  Babcock also knew, or should have known, that this UBS information was tipped in breach of a duty to UBS.  In 2001 and early 2002, while Franklin was still with Lyford Cay, Babcock monitored Lyford Cay's and Franklin's personal accounts for illegal trades based on UBS tips, and used that information to purchase and sell securities in his own personal account.

41.     After Franklin left Lyford Cay in early 2002, Babcock began directing some of Lyford Cay's trading. From early 2002 through 2003, Babcock continued monitoring Franklin's personal trading and using the UBS tips to purchase and sell securities both in both his personal account and for Lyford Cay. From late 2001 to 2003, Lyford Cay's illicit profits from this trading scheme were approximately $660,000.

42.     At Bear Stearns, Babcock worked on a trading desk with two other registered representatives of Bear Stearns, Andrew Srebnik and Ken Okada, who also had access to Franklin's trading information. Based on Franklin's trading patterns and discussions with Babcock, Srebnik and Okada each knew that Franklin was using material, nonpublic information to trade ahead of upcoming UBS analyst recommendations. Each also knew, or should have known, that this UBS information was tipped in breach of a duty to UBS. From at least December 2001 through May 2002, Okada monitored Franklin's trading at Bear Stearns for trades and used the UBS tips to purchase securities in his personal account. From at least March 2002 through June 2002, Srebnik also monitored Franklin's trading at Bear Stearns and used the UBS tips to purchase and sell securities in his personal account.

43.     As employees and registered representatives of Bear Stearns, Babcock, Srebnik, and Okada each owed a duty to Bear Stearns and its customers not to use material, nonpublic information for their own personal trading, or the trading of other customers. Bear Stearns's core compliance manual specifically provides that:

> In no event may any Bear Stearns employee who receives
> material non-public information about an issuer use that
> information to trade or recommend that issuer's securities
> or derivative securities of that issuer's securities for
> personal benefit, for Bear Stearns's benefit or for the

benefit of a third party (including any Bear Stearns
customer).

Babcock, Srebnik, and Okada each breached that duty by using material, nonpublic

information derived from Franklin's illegal trading, to trade securities in their personal

accounts, and, in the case of Babcock, to also trade securities for Lyford Cay.

### 3.    The Chelsey Capital Tippees' Illegal Trading

44.    In or around February 2002, Franklin left Lyford Cay and went to work as

an analyst for Chelsey Capital, a hedge fund where he had previously worked as a portfolio

manager.  When Franklin returned to Chelsey Capital in 2002, Franklin began tipping

material, nonpublic information concerning upcoming UBS analyst recommendations to

Mark Lenowitz, a portfolio manager for Chelsey Capital.  Franklin informed Lenowitz

that Franklin had a source at UBS that was providing this material, nonpublic

information.  Lenowitz knew, or should have known, that this information was being

tipped in breach of a duty to UBS.  On at least one occasion, Franklin showed Lenowitz a

text message from Guttenberg concerning an upcoming UBS analyst recommendation on

Franklin's disposable cell phone.

45.    Franklin worked at Chelsey Capital from approximately February 2002

through March 2003.  During that time period, Franklin regularly tipped Lenowitz material,

nonpublic information concerning upcoming UBS analyst recommendations, and Lenowitz

purchased and sold securities for Chelsey Capital using that information.  Chelsey Capital's

illicit profits from this illegal trading scheme exceeded $2 million.

46.    After Franklin and Lenowitz both left Chelsey Capital in 2003, Franklin

continued to tip Lenowitz material, nonpublic information concerning upcoming UBS

analyst recommendations.  In 2002 and 2003, Lenowitz used this material, nonpublic

information concerning upcoming UBS analyst recommendations to also purchase and sell securities in his personal accounts. Lenowitz's illicit profits in his personal accounts from this illegal trading exceeded $325,000.

### 4.    Q Capital's Illegal Trading

47.    In March 2003, Franklin left Chelsey Capital and opened a new hedge fund, Q Capital, in which Lenowitz was an investor and limited partner. From March 2003 through 2006, Franklin directed most of Q Capital's trading. Throughout this time period, Franklin purchased and sold securities for Q Capital using material, nonpublic information concerning upcoming UBS analyst recommendations tipped to him by Guttenberg. Q Capital's profits from this illegal trading exceeded $300,000.

### 5.    Examples of Illegal Trades from 2001 through 2006

48.    On December 3, 2001, while in possession of material, nonpublic information concerning an upcoming UBS downgrade on Allstate Corp. ("Allstate"), Lyford Cay sold short 10,000 shares of Allstate. Before the market opened the next trading day, December 4, 2001, UBS publicly announced it was downgrading its recommendation on Allstate stock from Strong Buy to Hold. That day the price of Allstate stock decreased, and Lyford Cay covered its short position in Allstate stock realizing illicit profits of $10,100.

49.    On December 19, 2001, while in possession of material, nonpublic information concerning an upcoming UBS upgrade on Lexmark International Group, Inc. ("Lexmark"), Franklin purchased 10,000 shares of Lexmark, and Lyford Cay and Babcock purchased 100 and 10 December 55 Lexmark call option contracts, respectively. Before the market opened the next trading day, December 20, 2001, UBS publicly

15

announced it was upgrading its recommendation on Lexmark stock from Hold to Buy.
That day the price of Lexmark stock increased, and Franklin, Lyford Cay, and Babcock
sold their Lexmark securities realizing illicit profits of $5,107, $6,750, and $1,000,
respectively.

50.     On December 20, 2001, while in possession of material, nonpublic
information concerning an upcoming UBS upgrade on U.S. Bancorp. ("Bancorp"),
Franklin purchased 25,000 shares of Bancorp, and Lyford Cay, Babcock, and Okada
purchased 300, 50, and 20 December 20 Bancorp call option contracts, respectively.
Before the market opened the next trading day, December 21, 2001, UBS publicly
announced it was upgrading its recommendation on Bancorp stock from Buy to Strong
Buy.  That day the price of U.S. Bancorp stock increased, and Franklin, Lyford Cay,
Babcock, and Okada sold their U.S. Bancorp securities realizing illicit profits of $6,933,
$3,000, $2,220, and $400, respectively.

51.     On March 7, 2002, while in possession of material, nonpublic information
concerning an upcoming UBS downgrade on Union Pacific Corp. ("Union Pacific"),
Babcock and Okada each purchased 50 March 65 Union Pacific put option contracts, and
Franklin and Lyford Cay each sold short 10,000 shares of Union Pacific.  Before the
market opened the next trading day, March 8, 2002, UBS publicly announced it was
downgrading its recommendation on Union Pacific stock from Buy to Hold.  That day the
price of Union Pacific stock decreased, and Babcock, Okada, Franklin, and Lyford Cay
closed their Union Pacific positions realizing illicit profits of $9,500, $4,650, $4,497, and
$6,200, respectively.

52.     On May 17, 2002, while in possession of material, nonpublic information concerning an upcoming UBS upgrade on Ivax Corp. ("Ivax"), Babcock purchased 40 June 12.50 Ivax call option contracts, and Franklin, Lyford Cay, and Srebnik purchased 25,000, 7,500, and 10,000 shares of Ivax, respectively. Before the market opened the next trading day, Monday, May 20, 2002, UBS publicly announced it was upgrading its recommendation on Ivax stock from Hold to Buy. That day the price of Ivax stock increased, and Franklin, Lyford Cay, Babcock, and Srebnik sold their Ivax securities realizing illicit profits of $29,697, $5,600, $1,970, and $5,800, respectively.

53.     On May 22, 2002, while in possession of material, nonpublic information concerning an upcoming UBS downgrade on Principal Financial Group, Inc. ("Principal Financial"), Babcock purchased 30 June 30 Principal Financial put option contracts, and Franklin, Lyford Cay, and Srebnik sold short 16,300, 6,000, and 3,000 shares of Principal Financial, respectively. Before the market opened the next trading day, May 23, 2002, UBS publicly announced it was downgrading its recommendation on Principal Financial stock from Buy to Hold. After the public announcement of the UBS downgrade, the price of Principal Financial stock decreased, and Babcock, Franklin, Lyford Cay, and Srebnik closed their positions realizing illicit profits of $900, $9,071, $2,370, and $1,260, respectively.

54.     On June 26, 2002, while in possession of material, nonpublic information concerning an upcoming UBS upgrade on Whole Foods Market, Inc. ("Whole Foods"), Franklin, Lyford Cay, and Chelsey Capital purchased 5,000, 5,000, and 30,000 shares of Whole Foods, respectively. Before the market opened the next trading day, June 27, 2002, UBS publicly announced it was upgrading its recommendation on Whole Foods

stock from Hold to Buy. That same day the price of Whole Foods stock increased, and Franklin, Lyford Cay, and Chelsey Capital sold their shares of Whole Foods realizing illicit profits of $1,234, $5,540, and $27,393, respectively.

55.     On October 22, 2002, while in possession of material, nonpublic information concerning an upcoming UBS downgrade of Marsh & McLennan Companies, Inc. ("Marsh & McLennan"), Franklin, Lenowitz, and Chelsey Capital sold short 22,500, 3,500, and 70,000 shares of Marsh & McLennan, respectively. Before the market opened the next trading day, October 23, 2002, UBS publicly announced it was downgrading its recommendation on Marsh & McLennan stock from Strong Buy to Buy. That same day the price of Marsh & McLennan stock decreased, and Franklin, Lenowitz, and Chelsey Capital covered their short positions in Marsh & McLennan stock realizing illicit profits of $27,264, $6,460, and $67,146, respectively.

56.     On November 7, 2002, while in possession of material, nonpublic information concerning an upcoming UBS downgrade of Mercury Interactive Corp. ("Mercury"), Franklin, Lenowitz, and Chelsey Capital sold short 15,000, 9,000, and 160,000 shares of Mercury, respectively. Before the market opened the next trading day, November 8, 2002, UBS publicly announced it was downgrading its recommendation on Mercury from Buy to Hold. That same day the price of Mercury stock decreased, and Franklin, Lenowitz, and Chelsey Capital covered their short positions in Mercury stock realizing illicit profits of $3,336, $6,195, and $131,460, respectively.

57.     On April 7, 2003, while in possession of material, nonpublic information concerning an upcoming UBS downgrade of Mellon Financial Corp. ("Mellon"), Franklin and Lenowitz sold short 7,000 and 6,000 shares of Mellon, respectively. Before

the market opened the next trading day, April 8, 2003, UBS publicly announced it was downgrading its recommendation on Mellon from Buy to Neutral. That same day the price of Mellon stock decreased, and Franklin and Lenowitz covered their short positions in Mellon realizing illicit profits of $4,436 and $3,560, respectively.

58.     On June 18, 2003, while in possession of material, nonpublic information concerning an upcoming UBS downgrade on CVS Corp. ("CVS"), Franklin and Lyford Cay each sold short 20,000 shares of CVS. Before the market opened the next trading day, June 19, 2003, UBS publicly announced it was downgrading its recommendation on CVS stock from Buy to Neutral. That day the price of CVS stock decreased, and Franklin and Lyford Cay covered their short positions in CVS stock realizing illicit profits of $13,530 and $7,874, respectively.

59.     On July 6, 2005, while in possession of material, nonpublic information concerning an upcoming UBS upgrade on Amgen Corp. ("Amgen"), Franklin and Q Capital purchased 7,500 and 22,000 shares of Amgen, respectively. Before the market opened the next trading day, July 7, 2005, UBS publicly announced it was upgrading its recommendation on Amgen stock from Neutral to Buy. That day the price of Amgen stock increased, and Franklin and Q Capital sold their shares of Amgen stock realizing illicit profits of $8,284 and $35,048, respectively.

60.     On January 25, 2006, while in possession of material, nonpublic information concerning an upcoming UBS downgrade on Humana, Inc. ("Humana"), Q Capital sold short 14,000 shares of Humana. Before the market opened the next trading day, January 26, 2006, UBS publicly announced it was downgrading its recommendation on Humana stock from Neutral to Reduce. That day the price of Humana stock

decreased, and Q Capital covered its short position in Humana stock realizing illicit profits of $20,591.

61.     On July 17, 2006, while in possession of material, nonpublic information concerning an upcoming UBS upgrade on UST, Inc. ("UST"), Q Capital purchased 8,000 shares of UST.  Before the market opened the next trading day, July 18, 2006, UBS publicly announced it was upgrading its recommendation on UST stock from Neutral to Buy.  That day the price of UST stock increased, and Q Capital sold its shares of UST stock realizing illicit profits of $4,512.

### C.     **Guttenberg's Insider Trading Scheme with Tavdy**

#### 1.     **Tavdy's Illegal Trading**

62.     Guttenberg and Tavdy are friends and former colleagues.  In the 1990s, they worked together at First Albany Corp., a registered broker-dealer based in Albany, New York.  Guttenberg's trading scheme with Tavdy began in or around 2002.

63.     From 2002 through March 2003, Tavdy was a proprietary trader and registered representative at Andover, a registered broker-dealer.  In March 2003, Andover was acquired by Assent, and Tavdy became a proprietary trader and a registered representative at Assent.  In 2005, Tavdy became a trader at Jasper Capital.

64.     From at least 2002 through 2006, in breach of his duty to UBS, Guttenberg regularly provided Tavdy with material, nonpublic information concerning upcoming UBS analyst recommendations, in exchange for sharing in the profits from Tavdy's illegal trading.  Tavdy knew, or should have known, that Guttenberg was breaching his duty to UBS by tipping Tavdy this material, nonpublic information.  During that time period, using this material, nonpublic information tipped by Guttenberg, Tavdy purchased and sold

securities in the proprietary accounts of Andover and Assent, in his personal accounts, in the accounts of Jasper Capital, and in the accounts of his sister-in-law and a friend. Illicit profits from Tavdy's illegal trading in these accounts exceeded $6 million.

### 2.  Jasper Capital's Illegal Trading

65.    David Glass is the owner and president of Jasper Capital, a day-trading firm that operates out of Assent's New York City offices. From May 2003 through February 2004, Glass also was a registered representative at Assent.

66.    Starting in 2003, a supervisory registered representative at Assent, in exchange for cash kickbacks from Glass, provided Glass with unauthorized computer access to secretly monitor Tavdy's trading in Assent's proprietary account, which had been very profitable, so that Glass could use that information to trade for Jasper Capital. Glass knew, or should have known, that this supervisor was breaching his duty to Assent by providing Glass unauthorized access to Tavdy's trading in this proprietary account.

67.    Based on Tavdy's trading patterns -- often making a profitable purchase or short sale of a security just before a UBS analyst upgrade or downgrade -- Glass knew that Tavdy was using material, nonpublic information to trade ahead of upcoming UBS analyst recommendations. Glass also knew, or should have known, that this information was tipped in breach of a duty to UBS.

68.    From at least 2003 through 2004, using unauthorized computer access to the Assent proprietary account in which Tavdy traded, Glass secretly monitored Tavdy's trading and used Tavdy's UBS tips to purchase and sell securities for Jasper Capital.

69.    In 2005, Tavdy was asked to leave Assent. Shortly thereafter, Glass recruited Tavdy to trade at Jasper Capital, so Glass could continue to obtain Tavdy's

UBS tips, and trade on that information for Jasper Capital.  Tavdy later confirmed to Glass that he had a source at UBS who provided him with tips of upcoming UBS analyst recommendations.  Tavdy also told Glass that he was sharing his illegal trading profits with his source.

70.    Because Tavdy previously had been asked to leave Assent, Glass did not disclose to Assent that Tavdy was trading in Jasper Capital's accounts at Assent.  Tavdy traded from an off-site location using Jasper Capital sub-accounts in the name of other individuals.

71.    With Glass' knowledge and approval, while associated with Jasper Capital in 2005 and 2006, using material, nonpublic information concerning upcoming UBS analyst recommendations tipped to him by Guttenberg, Tavdy purchased and sold securities in the accounts of Jasper Capital, and, for a time in 2005, also in the accounts of another entity where Glass had arranged for Tavdy to trade.  In addition, while Tavdy traded at Jasper Capital and this other entity, Glass continued monitoring Tavdy's trading and using Tavdy's UBS tips to purchase and sell securities for Jasper Capital.

72.    In or around August 2006, the Assent supervisor who had originally provided Glass with unauthorized computer access to Tavdy's trading in the Assent proprietary account, advised Glass that he and another official at Assent knew that Tavdy was trading through Jasper Capital.  The Assent supervisor offered not to disclose Tavdy's and Glass' trading scheme in exchange for a $150,000 kickback -- $100,000 for himself and $50,000 for the other official.  Glass and Tavdy agreed to pay this kickback.

### 3. Tavdy's Illegal Trading in Other Accounts

73.     From 2004 through 2006, Tavdy also used material, nonpublic information concerning upcoming UBS analyst recommendations tipped to him by Guttenberg, to purchase and sell securities in the accounts of his sister-in-law and a friend. Tavdy had trading authority in both of these individuals' accounts. The profits from Tavdy's illegal trading in these accounts totaled over $850,000.

### 4. Examples of Illegal Trades from 2002 through 2006

74.     On May 8, 2002, while in possession of material, nonpublic information concerning an upcoming UBS upgrade on Dow Chemical Co. ("Dow Chemical"), Tavdy purchased 2,000 shares of Dow Chemical. Before the market opened the next trading day, May 9, 2002, UBS publicly announced it was upgrading its recommendation on Dow Chemical stock from Hold to Strong Buy. That day the price of Dow Chemical stock increased, and Tavdy sold his Dow Chemical stock realizing illicit profits of $2,310.

75.     On March 21, 2005, while in possession of material, nonpublic information concerning an upcoming UBS upgrade on National Semiconductor Corp. ("National Semiconductor"), Tavdy purchased 15,000 shares of National Semiconductor. Before the market opened the next trading day, March 22, 2005, UBS publicly announced it was upgrading its recommendation on National Semiconductor stock from Neutral to Buy. That day the price of National Semiconductor increased, and Tavdy sold his National Semiconductor stock realizing illicit profits of $7,300.

76.     On August 8, 2005, while in possession of material, nonpublic information concerning an upcoming UBS downgrade on ADC Telecommunications, Inc. ("ADC"), Tavdy and Jasper Capital sold short 23,300 and 44,200 shares of ADC, respectively.

Before the market opened the next trading day, August 9, 2005, UBS publicly announced it was downgrading its recommendation on ADC stock from Buy to Neutral. That day the price of ADC stock decreased, and Tavdy and Jasper Capital covered their short positions realizing illicit profits of $9,972 and $17,332, respectively.

77.    On June 14, 2006, while in possession of material, nonpublic information concerning an upcoming UBS upgrade on Nvidia Corp. ("Nvidia"), Tavdy and Jasper Capital purchased 70,500 and 177,698 shares of Nvidia, respectively. Before the market opened the next trading day, June 15, 2006, UBS publicly announced it was upgrading its recommendation on Nvidia stock from Neutral to Buy. That day the price of Nvidia stock increased, and Tavdy and Jasper Capital sold their Nvidia stock realizing illicit profits of $56,555 and $165,259, respectively.

78.    On August 24, 2006, while in possession of material, nonpublic information concerning an upcoming UBS downgrade on Paccar, Inc. ("Paccar"), Tavdy and Jasper Capital sold short 13,200 and 11,400 shares of Paccar, respectively. Before the market opened the next trading day, August 25, 2006, UBS publicly announced it was downgrading its recommendation on Paccar stock from Neutral to Reduce. That day the price of Paccar stock decreased, and Tavdy and Jasper Capital covered their short positions realizing illicit profits of $16,960 and $9,682, respectively.

II.    **THE MORGAN STANLEY INSIDER TRADING SCHEME**

79.    Randi E. Collotta is an attorney who, from July 2003 through June 2005, worked in the global compliance department of Morgan Stanley. Part of her duties at Morgan Stanley included ensuring that confidential information, including material,

nonpublic information concerning the firm's investment banking clients, was maintained in accordance with firm policies and the federal securities laws.

80.     Through her position at Morgan Stanley, Randi Collotta had access to material, nonpublic information concerning upcoming corporate acquisitions involving Morgan Stanley's investment banking clients. As an attorney and employee of Morgan Stanley, Randi Collotta owed a fiduciary or other duty of trust and confidence to Morgan Stanley to keep confidential and not disclose or personally use this information. Morgan Stanley's Policy on Confidential Information, Inside Information, and Information prohibits "disclos[ing] confidential information to any person outside the Firm (including family members)," and also prohibits "trad[ing], encourag[ing] others to trade, or recommend[ing] financial instruments based on inside information."

81.     Information concerning an upcoming acquisition of a public company is valuable and material nonpublic information. Normally, when a public company is acquired, the acquisition price is greater than the pre-announcement market price of the stock of the company being acquired. Thus, news of an actual or even potential acquisition of a public company often results in an increase in the market price of company's stock. A reasonable investor would consider information concerning an upcoming corporate acquisition important to his or her investment decision, and a significant alteration of the total mix of information available to the public concerning the company that is the subject of the acquisition.

82.     In breach of her duty to Morgan Stanley, Randi Collotta, together with her husband, Christopher Collotta, a lawyer private practice, entered into a scheme with Jurman, a friend of Christopher Collotta who was a registered representative in Florida, to

25

trade on material, nonpublic information concerning upcoming corporate acquisitions involving Morgan Stanley's investment banking clients. Pursuant to this scheme, from at least 2004 through 2005, Randi Collotta misappropriated from Morgan Stanley material, nonpublic information concerning upcoming corporate acquisitions, and, together with her husband, tipped this confidential information to Jurman, in exchange for sharing in Jurman's illicit profits from trading on that information. Jurman knew that Randi Collotta was an attorney at Morgan Stanley and knew, or should have known, that this information was being tipped to him in breach of Randi Collotta's duty to Morgan Stanley.

83.     In 2004 and 2005, Jurman used this material, nonpublic information to purchase securities of companies that were the subject of upcoming acquisitions, before news of those acquisitions became public. Jurman also tipped this material, nonpublic information to his friend, Babcock, in exchange for sharing in Babcock's trading profits. Babcock was a registered representative at Bear Stearns and, as described previously, also was involved in the UBS insider trading scheme. Babcock knew, or should have known, that this material, nonpublic information concerning upcoming corporate acquisitions was tipped in breach of a fiduciary or other duty of trust and confidence to the source of the information.

84.     Throughout 2004 and 2005, the Collottas provided Jurman material, nonpublic information concerning numerous upcoming corporate acquisitions involving Morgan Stanley clients, including: (1) Penn National Gaming, Inc's acquisition of Argosy Gaming Co., which was publicly announced on November 3, 2004, (2) Johnson and Johnson's attempted acquisition of Guidant Corp., which was publicly reported by the news media on December 7, 2004 (3) Adobe Systems, Inc.'s acquisition of Macromedia,

Inc., which was publicly announced on April 18, 2005, (4) Prologis' acquisition of

Catellus Development Corp., which was publicly announced on June 6, 2005, and (5)

Unitedhealth Group, Inc.'s acquisition of Pacificare Health Systems, Inc., which was

publicly announced on July 6, 2005.

85.     With regard to each of these acquisitions, the stock price of the company

that was to be acquired sharply increased after the news of the acquisition or attempted

acquisition became public.  For example, on the afternoon of April 18, 2005, Adobe

Systems, Inc. announced a definitive agreement to acquire Macromedia in an all stock

transaction.  The Adobe announcement stated that under "the terms of the agreement,

which has been approved by both boards of directors, Macromedia stockholders will

receive, at a fixed exchange ratio, .69 shares of Adobe common stock for every share of

Macromedia common stock in a tax-free exchange."  On April 15, 2005, the trading day

prior to the public announcement, Macromedia's stock price closed at $33.45.  On the

trading day after the public announcement, April 19, 2005, Macromedia's stock price

closed at $39.37 -- up more than 17 % from the April 15, 2005 closing price.

86.     Using inside information he received from the Collottas, Jurman purchased

(in his personal account and the account of his father) call option contracts for shares of

Argosy Gaming Co., Guidant Corp., and Macromedia, Inc., before news of those

acquisitions became public.  Jurman sold these securities after the acquisitions were

publicly reported, realizing illicit profits in his personal accounts of at least $30,000, which

he shared with the Collottas.

87.     In addition, Jurman tipped Babcock material, nonpublic information he

received from the Collottas concerning the upcoming acquisitions of Macromedia,

Catellus, and Pacificare.  Using that inside information, Babcock purchased in his personal

account, call option contracts for shares of Macromedia and Pacificare, before those

acquisitions were publicly announced.  Babcock then sold these securities after the public

announcements, realizing illicit profits in his personal account of at least $75,000, which he

shared with Jurman.

88.     Babcock also tipped material, nonpublic information he received from

Jurman concerning the Catellus and Pacificare acquisitions, to Franklin and Okada, who,

as described previously, also were part of the UBS insider trading scheme.  Franklin and

Okada each knew, or should have known, that this information Babcock tipped them

originally was disclosed in breach of a fiduciary or other duty of trust and confidence to

the source of the information.  Using this inside information, Franklin purchased in the

accounts of Q Capital and in his father-in-law, shares of Catellus and Pacificare, before

those acquisitions were publicly announced.  Franklin then sold these securities after the

public announcements, realizing illicit profits of approximately $235,000, a portion of

which he shared with Babcock.

89.     Okada tipped the material, nonpublic information he received from Babcock

concerning the Catellus and Pacificare acquisitions, to his father-in-law.  Okada's father-in-

law used that inside information to purchase Catellus and Pacificare shares and call option

contracts in an account in the name of his son, before those acquisitions were publicly

announced.  Okada's father-in-law then sold these securities after the public

announcements, realizing illicit profits of approximately $310,000.

### FIRST CLAIM

**(Insider Trading in Connection with the Purchase or Sale of Securities)**

**(Violations of Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. §240.10b-5])**

90.     Paragraphs 1 through 89 are realleged and incorporated by reference.

91.     As described above, Defendants Guttenberg, Franklin, Tavdy, Lenowitz, Babcock, Srebnik, Okada, Glass, Q Capital, Chelsey Capital, and Jasper Capital engaged in an illegal insider trading scheme in which each used material, nonpublic information concerning upcoming UBS analyst recommendations to purchase or sell securities, and/or tipped others who used that inside information to purchase or sell securities.

92.     By reason of the conduct described above, Defendants Guttenberg, Franklin, Tavdy, Lenowitz, Babcock, Srebnik, Okada, Glass, Q Capital, Chelsey Capital, and Jasper Capital, in connection with the purchase or sale of securities, by the use of any means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or course of business which operates or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

93.     By reason of the conduct described above, Defendants Guttenberg, Franklin, Tavdy, Lenowitz, Babcock, Srebnik, Okada, Glass, Q Capital, Chelsey Capital, and Jasper Capital violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

**(Insider Trading in Connection with the Purchase or Sale of Securities)**

**(Violations of Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. §240.10b-5])**

94.     Paragraphs 1 through 93 are realleged and incorporated by reference.

95.     As described above, Defendants Randi Collotta, Christopher Collotta, Jurman, Babcock, Franklin, Q Capital, and Okada engaged in an illegal insider trading scheme in which each used material, nonpublic information concerning upcoming corporate acquisitions to purchase or sell securities, and/or tipped others who used that inside information to purchase or sell securities.

96.     By reason of the conduct described above, Defendants Randi Collotta, Christopher Collotta, Jurman, Babcock, Franklin, Q Capital, and Okada, in connection with the purchase or sale of securities, by the use of any means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or course of business which operates or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

97.     By reason of the conduct described above, Defendants Randi Collotta, Christopher Collotta, Jurman, Babcock, Franklin, Q Capital, and Okada violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM

**(Insider Trading in the Offer or Sale of Securities)**

**(Violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)])**

98.     Paragraphs 1 through 97 are realleged and incorporated by reference.

99.     As described above, Defendants Guttenberg, Franklin, Tavdy, Lenowitz, Babcock, Srebnik, Glass, Q Capital, Chelsey Capital, and Jasper Capital engaged in an illegal insider trading scheme in which each used material, nonpublic information concerning upcoming UBS analyst recommendations to sell securities, and/or tipped others who used that inside information to sell securities.

100.    By reason of conduct described above, Defendants Guttenberg, Franklin, Tavdy, Lenowitz, Babcock, Srebnik, Glass, Q Capital, Chelsey Capital, and Jasper Capital, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

101.    By reason of the conduct described above, Defendants Guttenberg, Franklin, Tavdy, Lenowitz, Babcock, Srebnik, Glass, Q Capital, Chelsey Capital, and Jasper Capital violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

A.      permanently enjoining Defendants Guttenberg, Franklin, Tavdy, Lenowitz, Babcock, Srebnik, Okada, Glass, Randi Collotta, Christopher Collotta, Jurman, Q Capital, Chelsey Capital, and Jasper Capital from violating Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

B.      permanently enjoining Defendants Guttenberg, Franklin, Tavdy, Lenowitz, Babcock, Srebnik, Glass, Q Capital, Chelsey Capital, and Jasper Capital from violating Securities Act Section 17(a) [15 U.S.C. § 77q(a)];

C.      ordering each Defendant to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received as a result of the conduct alleged in this Complaint, including, as to each Defendant, their own illicit trading profits or other ill-gotten gains, and, as to each tipper, the illicit trading profits or other ill-gotten gains of their direct and downstream tippees;

D.      ordering each Defendant to pay civil monetary penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; and

E.    granting such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

Robert B. Kaplan (RK 2310)
Jane M. E. Peterson (trial attorney)
Scott W. Friestad (SF 8048)
Brian O. Quinn
Christopher G. Swart

Attorneys for Plaintiff
Securities and Exchange Commission

SEC Division of Enforcement
100 F. Street, NE
Washington, DC  20549-4010
(202) 551.4468 (Peterson)
(202) 772.9245 (Facsimile)

Dated:  March 1, 2007